LON WHIPPLE, Plaintiff-Appellee, v. THE DEPARTMENT OF CORRECTIONS *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 85—1379

Opinion filed December 16, 1987.

McNAMARA, P.J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Candida Miranda, Assistant Attorney General, of Chicago, of counsel), for appellants.

Gail E. Mrozowski, of Cornfield & Feldman, of Chicago, for appellee.

JUSTICE WHITE delivered the opinion of the court:

This case arises out of an escape from Stateville Correctional Center on December 31, 1982. Plaintiff, Lon Whipple, worked as a tower guard during the 3 p.m. to 11 p.m. shift that evening and was charged with negligence in violation of Stateville Employee Rules 10 and 53, which essentially provide that the prevention of escape is paramount and that escape is attributable to employee negligence. After an administrative hearing, the hearing officer made an extensive set of factual findings and recommended that the charge against plaintiff be dismissed. The Civil Service Commission (hereinafter Commission) rejected the hearing officer's recommendation and ordered plaintiff's discharge. The Commission's decision adopted the hearing officer's findings to the extent that they were not inconsistent with the Commission's decision. Plaintiff then filed suit in the circuit court of Cook County against the Commission and the Department of Corrections seeking judicial review of the Commission's decision. The circuit court reversed and ordered plaintiff reinstated to his job with no penalty. The Commission and the Department of Corrections have appealed, contending that the manifest weight of the evidence supported the Commission's decision to discharge plaintiff.

On January 18, 1982, plaintiff began working at Stateville as a correctional officer-trainee, and was promoted on January 18, 1983, to the position of correctional officer. On December 31, 1982, while still a trainee, plaintiff was assigned to work the 3 p.m. to 11 p.m. shift in tower 5. Plaintiff had received that particular assignment twice each week since the previous April or May. Tower 5 was located at the corner of the north and west walls of the prison and was one of five towers situated along the north wall. The circular interior of tower 5 had

a diameter of about 10 feet and the tower contained windows and two doors. One of the doors led to a steel catwalk which extended seven or eight feet toward tower 4 along the north wall. The other door led to a steel catwalk which extended seven or eight feet toward towers 6 and 7 along the west wall. The catwalks were situated outside of the walls and the walls were about 40 feet high.

Sometime during the evening in question, three inmates, Randy Velleff, Patrick Cecconi, and Frank Amato, attempted to escape over the north wall at tower 4, which was located approximately 360 feet away from where plaintiff was stationed in tower 5. Of the five towers along the north wall, only towers 1 and 5 were staffed that evening. Velleff and Cecconi succeeded in escaping over the north wall at tower 4. The Commission contends on appeal that the manifest weight of the evidence disclosed that the escape occurred during plaintiff's shift and that he could and should have noticed the inmates' activities. Plaintiff contended below that the manifest weight of the evidence disclosed that the escape occurred after his shift had ended because no physical evidence of the escape was found until about 12:30 a.m. Plaintiff also contended that the manifest weight of the evidence did not show that he could or should have noticed the inmates' activities. Because of the nature of the parties' contentions, it is necessary to set forth the evidence in detail.

Five witnesses testified at the administrative hearing. First, Darrell Cobb, a supervisor at Stateville who was in charge during the night in question, testified that the prison was secured and that the inmates were counted early that night, about 6:30 p.m., because it was New Year's Eve. The count normally occurs about 9 p.m. After the count, at approximately 8:45 p.m., Cobb was informed that three inmates were missing, and Cobb ordered a search. He also testified that the tower guards were informed at 8:30 p.m. of a possible escape. At that time, the tower telephones were working. However, at approximately 9:30 p.m., a power failure occurred, knocking out the prison telephones until about 5:30 p.m. on January 1, 1983. At one point, Cobb testified that, to his knowledge, the area where plaintiff was stationed was unaffected by the power failure. At another point, he testified that the tower telephones were out of order beginning at 9:30 p.m. Regardless of whether or not the phones were working, the tower guards had radios which did work. Cobb testified that both tower 5 and tower 3 had lights, but that tower 4 lacked lights.

Sometime after 10 p.m., Cobb received a radio message that Amato had just appeared. Amato claimed that he had stumbled near the prison chapel at 4:30 p.m. and that he had lain there unconscious

until almost 10 p.m. There was mud on Amato's pants and shoes. Cobb then investigated the chapel area. He did not see any mud. To the contrary, the weather was extremely cold, and the ground was frozen. Cobb ordered a search of the sewers and ditches, which were the only places where water was running and where there could have been mud. The various searches yielded no results until 12:25 a.m. At that time, the guards found pipes placed against the inside of the wall in the position of a ladder. They also found a rope hanging down to the ground from a stanchion that protruded from tower 4. The rope was wrapped around the stanchion, and a piece of pipe 12 to 18 inches long was attached to the rope.

During cross-examination, Cobb contradicted his earlier testimony that tower 3 had lights and stated that only towers 1 and 5 had lights. He testified further that tower 5 had two spotlights, both of which were directed toward the inside of the institution. He said that one light was directed down the north wall, while the other light was directed to an area in the northwest corner of the prison yard. He also said that he was notified at 8:30 p.m. (rather than 8:45 p.m.) that someone was missing. At 10 p.m., he ordered a search of the areas inside and outside of the wall, but no evidence of an escape was discovered until 12:25 a.m., when the pipes were found lying on the ground west of and directly under tower 4.

During redirect examination, Cobb testified that there is no "obstruction from the towers."

The second witness, Randy Velleff, was one of the inmates who escaped. He was captured on March 4, 1983, in Dallas, Texas, and was incarcerated at Menard. Velleff testified that he chose New Year's Eve to attempt an escape because he believed that the prison would be understaffed that night. During the day, he had worked with the tunnel crew. He subsequently met Cecconi and Amato at the chapel. They went to the gymnasium until about 3 p.m. Then they "sort of just hung out" in the tunnel. They also hid in an underground manhole next to the block shop until about 6:30 p.m., when they left to gather rope and pieces of pipe which were stashed in an area between the block shop and the north wall. They reached the north wall at approximately 7:30 p.m., and attempted to assemble the pieces of pipe to create a makeshift ladder that they could use to scale the wall. The pieces of pipe, however, kept breaking apart and falling down, making noise in the process. The inmates themselves also made noise. They talked to each other and cursed at the pipe. When the pipe continued to fall apart, the inmates ran back through the prison yard to obtain more pipe. They then returned to the wall and tried to

reassemble the pipe, which continued to break, to fall, and to create noise. It took about five minutes to run over, pick up the pipe, and run back.

As to the lighting conditions, Velleff stated that the night was dark but not black "like I wanted." There were lights on in tower 3, but at 7 p.m. or 7:15 p.m. the lights went out. Velleff thought that they had been seen so they froze for about 10 minutes, made their way back to the end of a building, and lay there for a while. The lights in tower 3 eventually returned about 20 minutes after they had failed, and they remained on until Velleff and Cecconi scaled the wall. The lights were also on in tower 5. He described the area as "so well lit up, it is like a street lamp."

Velleff testified further that, after the pieces of pipe continued to break apart, he tied the rope to one piece of pipe. He and Cecconi then stood 15 to 20 feet from the wall and in front of tower 4 and tried to lasso the rope around the stanchion that protruded from tower 4. They threw the rope and the pipe about 15 times before finally getting it hooked over the bar. Of the 15 times that they threw the pipe, the pipe hit the steel tower 12 or 13 times. Each time that the pipe struck the tower, the impact created a very loud noise that sounded like a shotgun and that scared Velleff "witless." Velleff said that that occurred at about 9 p.m., when it was "dead quiet" in the yard. Velleff thought that the tower guard would hear the noise. After having lassoed the rope to the stanchion, Velleff worked the piece of pipe down the rope in order to fashion a double rope. This took 10 to 15 minutes. He and Cecconi then climbed up the rope in 3 to 5 seconds each. They waited on top of the wall for 10 minutes while Amato tried to climb up, but Amato was physically unable to climb the rope. Velleff then pulled up the rope and dropped it down the outside of the wall. He and Cecconi descended. Velleff looked at his watch when he touched down and noticed that it was 9:20 p.m. He and Cecconi proceeded to walk several miles to a steak house, where they called a cab and had a few drinks. They waited an hour and a half for a cab, because the cab company "didn't give us prompt service." As previously noted, Velleff was captured several months later, but the record does not indicate whether or not Cecconi was captured.

During cross-examination, Velleff testified that they crawled along the furniture factory in the prison yard in the course of the escape. He also stated that he was very much aware that there was no guard in tower 4, and that he thought that a guard was stationed in tower 3 until he started hitting tower 4 with the pipe. He said that a guard in tower 3 would have heard the noise. Velleff admitted that he had been

convicted of two prior armed robberies, as well as a credit card offense and the escape.

During redirect examination, Velleff stated that he thought that both towers 3 and 5 were unmanned because the inmates had made a great amount of noise yet were not discovered. He knew, however, that a corner tower such as tower 5 would always be manned at night.

The record also contains a transcript of testimony Velleff provided at Amato's trial, which was held about one month after Velleff testified at plaintiff's administrative hearing. During Amato's trial, and in Amato's presence, Velleff testified that he did not remember testifying at plaintiff's administrative hearing.

The third witness at the administrative hearing was Captain Ulsey Price, who was the correctional captain of the 3 p.m. to 11 p.m. shift but who previously had worked as a tower guard in tower 5. He described Stateville as a maximum security institution housing approximately 1,900 inmates, 90% of whom had committed a crime of violence. According to Price, a tower guard basically has the duty to be alert for the security, custody, and control of the residents in the front, sides, and back of his tower, and to guard against all unauthorized movement and activity. More particularly, the tower 5 guard is responsible for the entire area between the wall in front of tower 4 and the lumber yard. When the tower spotlight was on, the guard would be able to see the area on the road in front of the wall at tower 4, as well as various spots on the wall itself. On the night in question, the tower 3 and tower 5 spotlights were working during the 3 p.m. to 11 p.m. shift.

Price testified further that he previously had been in the tower 5 area between 7 p.m. and 10 p.m. and that the area is quiet at those hours because no one is supposed to be there. According to Price, any small noise in the prison yard would carry quite a distance at those hours.

Price said that the institution was secured at 6:30 p.m. or 6:45 p.m. that night. At 7:15 p.m. or 7:25 p.m. he received the first indication that something was amiss when he was informed that Velleff was missing. Fifteen minutes later he was informed that Amato and Cecconi were also missing. He then ordered a cell-to-cell search. After Amato was back in custody, they searched the outside perimeters of the walls, and found a rope on the outside of tower 4 at 11:35 p.m. or 11:45 p.m.

During cross-examination, Price testified that he did not know whether the lights had failed in tower 3 or tower 5; that tower 4 had

no lights; that only towers 1 and 5 were manned; and that the spotlights did not illuminate the entire area and that some dark areas remained. Most employees supplied their own flashlights. Between the time he learned that inmates were missing and 10 p.m., he searched the drainage ditch area twice, and he searched outside of the walls. Between 7:15 p.m. and 8 p.m., he checked the manholes. Before 9 p.m. he received a radio report from plaintiff concerning the warden's dog, which was barking. Price thought that someone called the warden about his dog.

During redirect examination, Price testified that the warden's house was behind tower 5.

The next witness was plaintiff. He testified that the only manned towers that night were towers 1, 5, 9, 10, 12, and 16. He stated that his duty was to guard everything within his range of vision. He said that "[i]f you can see it, you should guard it." He normally would walk around the inside of the circular tower. On December 31, 1982, he arrived at tower 5 several minutes before 3 p.m. He remained at tower 5 the entire time between 3 p.m. and 11 p.m. His routine required that he call the operator upon arrival and every 30 minutes thereafter. During the night in question, he also made several other calls. He called to report that the tower spotlights had malfunctioned. Although the spotlights were working when plaintiff started his shift, the two spotlights went out for five minutes at approximately 8:30 p.m. Plaintiff looked toward tower 9, and saw that the lights had gone out there, too. He grabbed his rifle and his radio and called the operator to report the power failure. He also went out on the catwalk several times to check the electric eye on the automatic device for the lights. According to plaintiff, he had no responsibility to position the spotlights, which were directed down into the yard.

Plaintiff testified further that he had a tower alert phone, an institutional phone, and a radio, and that the tower alert phone malfunctioned at 10 p.m. or 10:30 p.m.

The warden's dog normally barked every time plaintiff made his rounds around the tower. However, at 9 p.m. or shortly thereafter, the dog began to bark viciously, as if it had caught something. Plaintiff then called Price to report the matter.

When plaintiff worked in tower 5, he also normally heard a loose woodshed door banging in the wind. He heard what he believed to be the woodshed door during his December 31, 1982, shift.

Plaintiff stated that, from 6 p.m. to 9 p.m., he did not see anything unusual from tower 5 down the wall to tower 4. At 9:27 p.m., he was notified over the tower alert phone of a possible escape. He

was ordered to file one round as a warning first if he saw anyone moving who would not identify himself upon request, and then to shoot to kill.

At 9:30, plaintiff saw Price by tower 3. The lights were on in tower 3. He also saw other guards who were searching various areas outside of the wall, and he stood watch over them while they searched.

During cross-examination, plaintiff admitted that his radio and his regular phone continued to work even when the tower alert phone malfunctioned. At 9 p.m. he heard what he thought was a door banging against an object. The noise emanated from the direction of the warden's home. He did not remember whether the lights had gone out in tower 3, but he admitted that he could see Price standing inside the wall by tower 3 at about 9 p.m. when plaintiff called him concerning the barking dog. At one point, plaintiff said that he called Price on the radio, but at another point, plaintiff said that he had used the phone.

According to plaintiff, the job description for a tower 5 guard, which required that binoculars be in the tower, was not posted in tower 5 until after the escape. Plaintiff did not have binoculars that night. Binoculars were supplied after the escape.

He admitted that he was supposed to secure everything within his vision, but he was evasive as to exactly what was within his vision. When asked whether he was supposed to watch the furniture factory, he responded, "[i]f I could see it." He gave similar responses with respect to the lumber yard, the soap shop, and the M & M shop. He admitted that the area extending in a straight line out from tower 4 in toward the institution was part of his area of observation. He denied that he could see the rope in front of tower 4. When asked whether he was supposed to call one of his superiors to report that he could not see an area, he responded, "I have never been told that. I've never seen it in writing." He stated further that no one ever told him to call Price to report that he could not see certain areas. Plaintiff admitted that he did not call either one of his two supervisors that night (one of whom was Price) to say that he could not see certain areas, even though he had been notified at 9:27 p.m. of the escape.

Plaintiff said that the vicious barking of the warden's dog lasted about seven minutes. Plaintiff stood on the catwalk and looked into the warden's yard, but did not see anything.

During redirect examination, plaintiff testified that there were no lights outside of the warden's house, and that tower 5 had two lights which were pointed toward the yard and which slightly illuminated

the back of the M & M shop. He said that the position of the lights was the same on the night in question as it had been since he first started to work in tower 5 in April or May 1982. After the escape, however, in February 1983, the lights were adjusted to illuminate the walls instead of the yard. Plaintiff said that he continued to work at Stateville until May 1983, although not in tower 5. Finally, plaintiff reaffirmed that the warden's dog was barking in a very vicious way.

Another correctional officer who worked the 3 p.m. to 11 p.m. shift during the night in question, Dennis Dziurowitz, testified that he conducted a search in a van between 9:30 p.m. and 10:15 p.m. He circled the walls and passed tower 4 five times without noticing the dangling rope or anything else unusual.

During cross-examination, he admitted that he did not get out of the van to inspect the area or wall around tower 4. He also admitted during re–cross-examination that there were no lights illuminating the outside of the wall around tower 4. He drove about 10 miles per hour.

Ulsey Price was then recalled as a rebuttal witness. He testified that plaintiff called him about 9 p.m. concerning the dog. Price was near tower 3 at the time. Between 9:15 p.m. and 9:30 p.m., he again spoke with plaintiff from 75 to 100 feet away from tower 5, but Price denied that he notified plaintiff of the escape. He stated that the tower hook-up would have done that. He did not state the subject matter of his second conversation with plaintiff.

Among the documentary evidence introduced at trial were photographs of the institution, only some of which are contained in the record on appeal; the job description for a tower 5 guard, which specified the required equipment, including binoculars, and which provided that the guard is responsible for the area within his view; and a January 13, 1983, evaluation of plaintiff's job performance, which reflected that plaintiff met expectations and that he "has displayed the skills of a good professional officer and should be certified at this time." Prison records for December 31, 1982, apparently were destroyed pursuant to the prison's practice of retaining records for 90 days, and therefore were not in the administrative record.

After the hearing, the hearing officer prepared a recommended decision containing 14 pages of findings. She found that four factors had contributed to the escape: (1) the power failure, (2) insufficient lighting, (3) understaffing in the towers, and (4) insufficient equipment in the towers. She also found that there was no evidence that plaintiff could have heard the noise made by the inmates 360 feet away, and that there was insufficient evidence that the escape occurred during plaintiff's shift. She pointed out that plaintiff regularly

called in and that he also called in to report that the warden's dog was barking in a particularly vicious manner. She questioned why plaintiff had been retained as an employee for months after the escape if he had been negligent. She concluded that the charge of negligence had not been proved and recommended that plaintiff be reinstated to his job, with no penalty.

In a one-page decision which partially adopted the hearing officer's findings, the Commission found that there was substantial evidence to support the charges because plaintiff should have noticed the repeated noise of the pipe striking the wall and because the lights were not so faulty that the area of the escape was not illuminated. The Commission advised the Department of Corrections to address the security problems raised by plaintiff.

The circuit court of Cook County reversed the Commission's decision and ordered plaintiff reinstated with no penalty, concluding that the Commission's findings that plaintiff should have heard the noise and that the lights were adequate were not supported by the record. The trial court stated further that it was possible that the Commission did have a basis for finding plaintiff negligent but that the Commission failed to include the basis in its decision. Finally, the trial court criticized the Commission for arbitrarily adopting the findings of the hearing officer yet rejecting her recommendation without making its own specific findings. The Commission and the Department of Corrections have appealed from the trial court's decision.

■■ ■ Commission decisions are reviewable under the administrative review law. (Ill. Rev. Stat. 1985, ch. 127, par. 63b111a.) Under the administrative review law, the factual findings and conclusions of the administrative agency are considered to be *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3–110.) The standard for judicial review of an administrative decision concerning the discharge of an employee is whether the agency's findings of fact are contrary to the manifest weight of the evidence, and whether the findings provide a sufficient basis for the agency's decision that cause for discharge does or does not exist. (*Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 97, 454 N.E.2d 265.) Thus, the standard is a two-step process. (*Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 550, 426 N.E.2d 885.) First, the court must determine whether the agency's factual findings are contrary to the manifest weight of the evidence. (*Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 550, 426 N.E.2d 885.) Second, the court must determine whether the decision was arbitrary and unrea-

sonable or unrelated to the requirements of plaintiff's service. (*Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 105, 449 N.E.2d 115; *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 552, 426 N.E.2d 885; *Secretary of State v. Kunz* (1983), 116 Ill. App. 3d 736, 452 N.E.2d 387.) In other words, after reviewing the agency's factual findings, a court of review must determine whether those findings furnish a sufficient basis for the agency's conclusion that cause for discharge existed. "Cause" for discharge means:

> " '[S]ome substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position.' " (*Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 551, 426 N.E.2d 885.)

The failure to perform job duties adequately constitutes sufficient cause for discharge of a public employee. *Norris v. Comm'n on Human Relations* (1975), 26 Ill. App. 3d 528, 537, 325 N.E.2d 818.

■ Application of the above principles to the case at bar leads to the conclusion that the Commission's determination was against the manifest weight of the evidence, and it is therefore unnecessary to address the issue concerning cause for discharge. The manifest weight of the evidence discloses that there were a number of breaches in security at Stateville that night, and that plaintiff exercised care during his watch.

Velleff deliberately planned the escape for New Year's Eve because he expected the prison to be understaffed that night. Indeed, only two of the five towers along the north wall were manned that night. Velleff selected an area of the wall near tower 4, which was unmanned and unlit, and which was about 360 feet away from where plaintiff was stationed in tower 5. There was no evidence that the noises made by the inmates would carry 360 feet. Furthermore, the spotlights in tower 5 were directed down into the yard rather than along the wall, and they malfunctioned. Even when they are working, however, areas remained dark, according to Price. Moreover, the telephones malfunctioned. There were no binoculars in tower 5 even though binoculars were required by the job description. There was a loose woodshed door which normally banged in the wind at night. Velleff, Amato, and Cecconi had been hiding and running around the prison since 3 p.m. Plaintiff, on the other hand, was at his post at all times during his shift. He called the operator every 30 minutes as re-

quired. He also reported the power failure and the vicious barking of the warden's dog.

The lapse in security, and plaintiff's vigilance during his watch, demonstrate that the Commission's decision was against the manifest weight of the evidence. We therefore affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

RIZZI, J., concurs.

PRESIDING JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority holding which finds the Commission's decision to be against the manifest weight of the evidence. I believe that the evidence amply supports the Commission's decision to discharge plaintiff, and that under the narrow confines of the relevant standard of review the trial court erred in reweighing the evidence and substituting its own judgment on factual issues. I would reverse the trial court's decision and order the Commission's decision to be reinstated.

The majority recites the trial court's criticism of the "Commission for arbitrarily adopting the findings of the hearing officer yet rejecting her recommendation without making its own specific findings." (164 Ill. App. 3d at 911.) The majority errs in relying upon such reasoning. It ignores the well-established principles under which the Civil Service Commission may adopt its hearing officer's findings and reject the officer's recommendation. Our supreme court recently addressed this issue and expressly rejected the rationale adopted by the majority:

> " '[I]t is not necessary that testimony in administrative proceedings be taken before the same officers who have the ultimate decision-making authority. [Citations.] *** [A]dministrative proceedings may be conducted by hearing officers who refer the case for final determination to a board which has not "heard" the evidence in person. The requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determination thereon.' [Citations.] *** [T]here is no requirement, as plaintiff suggests, that the Commission rehear the evidence in order to reject its officer's findings and recommendations." (*Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 100-01, 454 N.E.2d 265, 269.)

The court then compared the Civil Service Commission to the Industrial Commission:

> "In an analogous context this court has consistently held that questions of fact are within the province of the Industrial Commission, \*\*\* and regardless of whether the Commission hears additional evidence, it is not bound to accept the findings of the arbitrator; whether or not it disagrees with the arbitrator, the Commission's findings will not be disturbed on review unless contrary to the manifest weight of the evidence. [Citations.]" (*Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 100-01, 454 N.E.2d 265, 269.)

The majority errs, therefore, in relying upon the trial court's reasoning.

As the majority recognizes, the scope of a court's duty in reviewing a decision of the Civil Service Commission is severely limited to determining whether the Commission's findings are supported by the manifest weight of the evidence. (*Heng v. Foster* (1978), 63 Ill. App. 3d 30, 379 N.E.2d 688.) The Commission's findings and conclusions on questions of fact are *prima facie* true and correct, and the reviewing court must examine the findings only to determine if they are supported by the manifest weight of the evidence. (*Monroe v. Civil Service Comm'n* (1965), 55 Ill. App. 3d 354, 204 N.E.2d 486.) The court may not reweigh the evidence or make its own independent determination of the facts. (*Oratowski v. Civil Service Comm'n* (1954), 3 Ill. App. 2d 551, 123 N.E.2d 146.) A finding is against the manifest weight of the evidence when an opposite conclusion must be clearly evident from the record. There must be something more than conflicting testimony to warrant a conclusion that the administrative findings of fact are erroneous. *Norris v. Comm'n on Human Relations* (1975), 26 Ill. App. 3d 528, 325 N.E.2d 818.

In the present case, the Commission had before it evidence that the prisoners were in the area of tower 4 for nearly two hours during plaintiff's shift. During this time, they assembled pipes, ran back and forth across the yard to retrieve more pipes, fashioned a ladder with ropes and pipes, climbed the wall, and escaped. It is incredible that plaintiff noticed nothing.

Velleff testified that he threw the pipe at the end of the rope 15 times and that it hit a metal bar 12 or 13 times, sounding like a shotgun. The pieces of pipe kept breaking and falling down, making noise in the process. The inmates also made noise by talking to each other and cursing at the pipe. Velleff said it was dead quiet in the yard and he thought the tower guard would hear the noise.

"The first, I'd say, the first five, six times, I was just scared witless, like, because it hit the tower and it let off a sound. And this was at night, now, this was going on at 9:00, or maybe it was a little after 9:00, and everything is dead quiet out there; and man, when I hit that pipe against that steel tower, it was like a shotgun, and I hit that wall, I tried to become a part of that wall, because I thought the tower man, he's going to hear it and he's just going to blow \*\*\* us away."

The Commission was entitled to rely on these facts and reasonable inferences which may be drawn from them. I would conclude that opposite conclusions regarding the lighting, time of escape, number of guards, noise, and other equipment are not clearly evident from the record. Instead, there is conflicting testimony on these factual issues, and the Commission was entitled to resolve these conflicts. There was abundant evidence from which the Commission could conclude that plaintiff was negligent. That negligence contributed to the escape of two convicted felons from a maximum security penitentiary, and the decision to discharge plaintiff was proper.

After reviewing the record as a whole, I find that the evidence amply supports the Commission's decision and that it is not contrary to the manifest weight of the evidence. The trial court erred in substituting its judgment for that of the Commission. I would reverse the judgment of the circuit court of Cook County and reinstate the Commission's decision.