SANDRA ZAREMBA, Plaintiff-Appellee, v. THE DEPARTMENT OF VEHICLE SERVICES, of the Office of the Secretary of State, *et al.*, Defendants-Appellants.

First District (6th Division)  No. 1—99—2746

Opinion filed October 6, 2000.

James E. Ryan, Attorney General, of Chicago (Janon E. Fabiano, Assistant Attorney General, of counsel), for appellants.

Joseph A. Morris, of Morris, Rathnau & De La Rosa, of Chicago, for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

In September 1995, the Secretary of State (SOS) Department of Vehicles Services (DVS) suspended plaintiff Sandra Zaremba, without pay. In October 1995, plaintiff received an official notice of discharge and filed a written request for a hearing before the Merit Commission (Commission). The Commission determined that the discharge was proper. In October 1998, plaintiff sought judicial review in the circuit court. In June 1999, the circuit court rejected the Commission's decision, finding that it was against the manifest weight of the evidence and that it was arbitrary and capricious. DVS appeals, arguing that (1) the Commission's decision was not against the manifest weight of the evidence; and (2) sufficient cause existed to terminate plaintiff's employment. We affirm.

## I. BACKGROUND

Plaintiff began working at DVS in February 1975. Since approximately 1989, plaintiff worked as a "fleet cashier" or "fee clerk." As such, she processed bulk work submitted by professional remitters on behalf of car dealers, currency exchanges, fleet owners, and similar processors of large quantities of vehicle title and registration documents. She worked with three or four other fleet cashiers at the Charles Chew facility in Chicago. Fleet cashiers do not serve the general public but, rather, work with seven or eight professional remitters. A remitter's duties include retrieving title and license applications from currency exchanges and automobile dealerships and taking them to the Secretary of State for processing by the fleet cashiers. Although remitters are not DVS employees, they generally work closely with the same fleet cashiers all day every day. The record indicates that fleet cashiers do not interact with the general public. Additionally, their duties are not discretionary but, rather, administrative in nature. Aside from the instant controversy, no evidence exists in the record indicating that plaintiff has been a bad employee.

Michael and Sheila Davis (married) worked as remitters at the Chew facility. In early 1995, SOS discovered that Michael was cheating the State by changing the dates on applications to take personal advantage of a fee change. The State prosecuted Michael but accepted a plea agreement. Pursuant to the agreement, Michael would assist SOS in investigating allegations that fleet workers were accepting bribes. The record does not indicate whether those allegations came from Michael or another source. In any case, SOS assigned one of its police officers, Craig Moss, to work undercover in the Chew facility. In March or April 1995, Michael brought Moss to the Chew facility and introduced him as Sheila's cousin. Michael told everyone that Moss

was down on his luck and that he decided to give Moss a job in his remitting business.

Moss spent six months conducting an investigation at the Chew facility. In September 1995, based on Moss' investigation, DVS formally suspended plaintiff without pay, alleging that she accepted $175 from Moss (spread over eight separate occasions between April 1995 and June 1995), knowing or reasonably believing such money was tendered as an inducement to perform her normal work duties. Specifically, DVS alleged that, by accepting money from Moss, plaintiff violated several provisions of the Secretary of State's *Policy Manual*. The pertinent provisions include:

> "Employees and contractors of the Secretary of State in performance of their duties, execute a public trust which requires their adherence to the highest possible standards of ethical conduct. Adherence to such conduct will promote the courteous, efficient, professional and lawful delivery of service to the citizens of Illinois. Furthermore, the specific standards are to be followed by all employees of the office. Violations of any standards are grounds for disciplinary actions and possible discharge." *Policy Manual*, ch. 1, no. 1, Code of Ethical Conduct.

> "Employees and contractors of the Secretary of State shall: (a) obey all laws, ordinances, rules and regulations \*\*\* and (d) not use their respective official positions or knowledge acquired through such official positions for personal gain." *Policy Manual*, art. 4, Lawfulness.

> "The following specific acts of conduct may result in discipline up to and including discharge: \*\*\* (b) any conduct or action taken to use the employee's official position for personal gain or influence \*\*\* and (m) soliciting or accepting any gratuity, gift, present or reward or other thing of value in return for the performance of the employees' official duties, or as a condition for not performing such duties." *Policy Manual*, art. 5, Standards.

In October 1995, plaintiff received her official notice of discharge and filed a written request for a hearing before the Commission.

In June 1998, the Commission conducted a hearing on plaintiff's case. At the hearing, the administrative law judge (ALJ) granted DVS' motion to amend the charges against plaintiff to add that (1) on May 2, 1995, plaintiff was offered money to make up for a cash shortage in her drawer and, while she did not accept the money, she failed to report the incident as an attempted bribe; and (2) on May 26, 1995, plaintiff failed to report an attempted bribe of $40. Also at the hearing, the parties stipulated that the State indicted plaintiff for her alleged misconduct and that she was acquitted.

Moss testified at the hearing and described plaintiff's conduct on

each of the eight occasions on which he gave her money. According to Moss, on April 18, 1995, plaintiff asked Michael Davis whether he would buy lunch that day. Davis gave plaintiff $30 and told her to "buy the girls lunch with it." Plaintiff testified differently. She claimed that Moss offered her money that day but she declined. She further stated:

> "He said, 'Sandra, you did a really great job.' He had the money, and I looked at him. I grabbed him by the arm and took him to Michael. I said, 'Michael, [Moss] is looking for you. He was about to give me some money for doing a good job. Would you tell him that we can't accept money for doing our jobs?'
>
> I told him, '[Moss], you told us to eat pizza the other day, but we all bought that pizza together. We are friends here. Michael and I were friends for a long time, and we eat a lot together sometimes.' I said, '[y]ou are welcome to be a part of that if you want; but if you feel like paying me to do my job, then don't offer me anything.' "

According to plaintiff, she did not really believe that Moss was trying to bribe her. Rather, she merely thought he was being grateful. She also testified that she later told her supervisor, Darneather Murph-Heath, about the incident.

Moss also testified that, on April 25, 1995, he gave plaintiff $20 and told her that it was "to buy the cashier's breakfast." He told her to "split it up amongst the girls." Plaintiff testified that she had already been taking orders for breakfast and collecting money when she asked Moss if he wanted anything. Moss told her that he and Michael wanted to buy breakfast for everyone. Plaintiff further testified that she then returned the money she had collected from the others, including that belonging to remitters.

Moss next testified that, on May 2, 1995, he gave plaintiff $10. She "just laughed and thanked [him]." However, plaintiff denied this incident. Also, according to Moss, later that day plaintiff had a cash shortage in her drawer and Moss offered her $20 to make up for the shortage. Plaintiff told Moss not to worry about it and to go home. Plaintiff testified that she refused the money because she did not know whether she had made an error or, alternatively, whether he had failed to pay for a motorcycle plate. She also stated that she thought it was probably her error and that, in that case, she did not want to accept money for her mistake.

Moss also testified that, on May 16, 1995, Michael Davis asked plaintiff if she would work through lunch if Moss paid her. According to Moss, plaintiff

> "[t]old us that we can't give her money and say, '[h]ere, take this.'

That would be a bribe. And that we would just have to basically of-fer it. And I basically said, '[w]ell, what is the difference?' She said there is a lot of difference between *** '[h]ere, take this,' and, you know, '[d]o you want this?' "

Moss also testified that, later that day, he gave plaintiff $20 "[f]or do-ing our work." However, Moss did not actually tell plaintiff the reason for the gift. He simply told plaintiff to "[u]se it and buy the crew some drinks tonight" at a retirement party.

Moss next testified that, on May 23, 1995, he gave plaintiff $20 for "processing the work." Again, Moss admitted that he did not actually *tell* plaintiff the money was for doing the work but, rather, he simply told plaintiff that the money was for lunch. Plaintiff recalled this transaction and explained:

"I was the one that was going to pick [lunch] up and he would give [money] to me and said he was paying for the chicken; and the rest of the month it was given to me by the other cashiers who paid for side dishes, lots of different side dishes. He would say that he was paying for the chicken."

On those occasions, the remitters, as well as the cashiers, participated in the common meal.

Moss also testified that, on May 26, 1995, he gave plaintiff $25. He thanked plaintiff and "all the girls" stating, "[t]his is for lunch. You and the girls get lunch." Moss also claimed that, later that day, he of-fered plaintiff another $40. He stated that plaintiff declined, explain-ing that she had already accepted $25 that day and that she split it with the other girls as he asked. However, plaintiff denied that Moss ever made the second offer.

According to Moss, on June 9, 1995, and again on June 23, 1995, he offered plaintiff money and thanked her for her work. She accepted the money and thanked him.

Plaintiff's testimony indicates that she believed these transactions arose from a social relationship. She stated that the fleet cashiers and remitters working at the Chew facility enjoyed a collegial atmosphere. They regularly bought each other lunch or breakfast. Other times, the fleet cashiers and remitters pooled money or brought food from home to share as common meals. She also stated that she often shared or of-fered to share food with her coworkers, including Moss. She further testified that she had a particularly close relationship with the Davis family. They often met outside of work and socialized at weddings, parties, and in each others' homes. Plaintiff also testified that social relationships among the fleet cashiers and remitters was so pervasive that one cashier held her wedding ceremony in the fleet room. Accord-ing to plaintiff, all the cashiers and remitters contributed to purchase

refreshments for the wedding celebration. In sum, the gist of plaintiff's testimony was that she believed Moss' offers were simply in accord with the close relationship she and her coworkers enjoyed.

Tina Prose also testified at the hearing. She stated that she is the director of the department of personnel for the Secretary of State. Under the SOS' policy manual, if an employee uses his or her official position for personal gain, he or she may be discharged. However, Prose admitted that the manual does not prohibit employees from accepting gifts from friends, relatives, neighbors or coworkers. The SOS policy manual similarly does not prohibit employees from sharing lunches or meals with remitters.

Plaintiff's supervisor, Darneather Murph-Heath, testified at the criminal trial of plaintiff's coworker, Carissa Thomas. At plaintiff's hearing before the Commission, the parties stipulated to Murph-Heath's testimony. According to Murph-Heath, plaintiff had no control over which remitter she worked with on a given day. Rather, Murph-Heath and her assistant assigned cashiers to a remitter. Also, Murph-Heath testified that remitters regularly contributed, along with cashiers, to "a community lunch thing." She further testified that she sometimes participated in these community lunches and "put money in for that purpose." She also witnessed her supervisor, James Harris, participate in such lunches.

Murph-Heath also testified that she was familiar with the SOS policy manual. She opined that accepting money from a remitter for the purposes of buying shared food, or accepting money for later use at a party, did not constitute a violation. She further opined that lunch did not constitute a gift or gratuity within the meaning of the policy manual.

James Harris also testified at Carissa Thomas' criminal trial. Again, the parties in this case stipulated that Harris would provide similar testimony before the Commission. Harris is the manager of the vehicle service department at the Chew facility. He testified that he observed remitters and cashiers eating meals together. He further testified that no remitter ever complained about having to buy meals for the cashiers. To his knowledge, the cashiers sometimes bought the remitters lunch, and conversely, the remitters sometimes bought the cashiers lunch. Harris admitted that a remitter giving a cashier $20 to buy lunch could constitute a policy violation. However, Harris added, "its been a practice in the past."

In August 1998, the ALJ issued a recommended decision. The ALJ found that plaintiff violated the SOS policy manual by accepting money on eight dates in exchange for doing her job. The ALJ opined:

"[Plaintiff] may have convinced herself that she could accept the

money if it was for lunch rather that for doing her job, but the hearing officer is not convinced. The only reason she was receiving 'lunch money' was that she was processing Moss' work. Even if she actually used the money to buy lunch, she was using her position for profit, since the only reason she was given money to buy lunch was that she was working at the Secretary of State's office processing remitters' work. She is not permitted to receive money from the public for processing work, because it calls into question the public trust and gives rise to the appearance of impropriety even if none actually exists. That is the purpose of the policy against gratuities."

The ALJ recommended that the Commission find DVS proved the charges of plaintiff accepting gratuities on the eight dates specified in the original charges. However, the ALJ further recommended that the Commission find that DVS failed to prove the two additional charges (*i.e.*, that plaintiff accepted money as a bribe and that she failed to report a bribe). The ALJ also concluded that plaintiff's conduct constituted grounds for discharge. In September 1998, the Commission adopted the ALJ's recommendation.

In October 1998, plaintiff sought judicial review in the circuit court. In June 1999, the circuit court rejected the Commission decision, finding that it was against the manifest weight of the evidence and that it was arbitrary and capricious. The court found that DVS failed to demonstrate that plaintiff accepted money knowing or believing that it was tendered as an inducement to perform her work or that it was a financial reward for performing such work. Rather, the court found, the evidence suggested that such money was simply a friendly gift to be used for "group lunches." The court further deemed discharge a harsh penalty and found that "a more reasonable approach would have been a warning before discipline," particularly because plaintiff's supervisors did not believe she violated the policy manual. DVS and the Commission appeal from the circuit court's decision.

## II. ANALYSIS

■ Our review of an administrative agency's decision to discharge an employee requires two steps. We must consider: (1) whether the agency's findings of fact are contrary to the manifest weight of the evidence; and (2) whether the findings of fact provide a sufficient basis for discharge or, rather, whether the decision was arbitrary, unreasonable, or unrelated to the requirements of the service. *Whipple v. Department of Corrections*, 164 Ill. App. 3d 902, 911-12 (1987); *Sutton v. Civil Service Comm'n*, 91 Ill. 2d 404, 407 (1982).

## A. Whether Findings are Against the Manifest Weight of the Evidence

DVS first argues that the Commission's decision was not against the manifest weight of the evidence. We disagree.

In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative agency. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. *Abrahamson*, 153 Ill. 2d at 88. An administrative agency's factual determinations are contrary to the manifest weight of evidence where the opposite conclusion is clearly evident. See *Abrahamson*, 153 Ill. 2d at 88.

The facts of this case do not support the Commission's decision. As the ALJ noted:

> "Moss stated that his intent, for giving the money, was to either get [plaintiff] to do his work or to get [plaintiff] to do his work faster. It is clear that Moss did not pay [plaintiff] every day, and it is also clear that he *never* told [plaintiff] that he wanted her to work faster. The evidence was also clear that she could *not* be induced to work for him, because all of her work was *assigned by a supervisor*. There was *no evidence* that [plaintiff] *ever* slowed or speeded up her work flow in response to financial offers or for any other reason." (Emphasis added.)

The ALJ, however, concluded that the foregoing was not dispositive. As noted above, the ALJ opined that "the only reason she was receiving 'lunch money' was that she was processing Moss' work" and that such money constituted an improper gratuity in exchange for doing her job. The circuit court disagreed, finding:

> "[I]t is clear that there was no proof that [plaintiff] ever personally kept the funds knowing or believing that they were tendered for inducement to perform her work duties or as a financial reward for a job well done. There was only evidence that she used the funds for lunches in keeping with a long standing practice. The ALJ misses the point *** that the money was used for group lunches which all participated in—cashiers, other personnel, [and] remitters."

■ We agree with the circuit court and conclude that the Commission's decision contradicts the manifest weight of the evidence. While Moss testified as to his *subjective* reason for giving plaintiff money (*e.g.*, "to do her work"), he *never* communicated this reason to plaintiff. As Moss admitted, he never expressly offered plaintiff money to induce her to do her work. *Cf. People v. Wright*, 105 Ill. App. 3d 187,

190 (1982) (stating that a defendant must accept or agree to accept money *knowing* that it was offered with the intent to influence).

We also conclude that an insufficient basis exists to find that plaintiff *should* have known the reason for Moss' gift. Plaintiff contends that she believed these transactions arose from a social relationship. The ALJ rejected plaintiff's argument on this point, noting that a social relationship with Sheila Davis did not constitute a social relationship with Moss. However, the ALJ failed to consider the evidence in its entirety. The record indicates that plaintiff had a social relationship with the office as a whole and that Moss contributed to that atmosphere. The record also indicates that Moss bought meals for other people in the office, including remitters (who performed no work for him). Further, ample evidence exists in the record suggesting that those working at the Chew facility *regularly* shared meals and bought meals for one another. This "treating" did not solely consist of remitters buying lunch for the cashiers—it also consisted of cashiers buying meals for remitters. We also note that some of Moss' transactions with plaintiff occurred on days when plaintiff was not even assigned to process his work. Therefore, we find that the Commission's decision contradicted the manifest weight of the evidence.

## B. Whether a Sufficient Basis for Discharge Exists

DVS also argues that the Commission properly determined that sufficient cause for discharge existed. We disagree and find that the Commission's decision was arbitrary and capricious.

■ ■ "Cause" is often defined as "some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place." *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill. 2d 83, 89 (1998).

The circuit court rejected DVS' argument, finding:

"[T]he record reflects the fact that neither [plaintiff], her supervisor Murph-Heath[,] nor Harris, the chief Secretary of State administrator at the facility, had actually read the entire [p]olicy [m]anual. The [c]ourt notes that the severity of [plaintiff's] discipline is extraordinarily harsh given the state of affairs at the Chew Facility—where even her supervisors believed that [plaintiff] was not doing anything in violation of the [p]olicy [m]anual. Given that the *** [p]olicy [m]anual provides for progressive disciplinary action, a more reasonable approach would have been a warning before discipline. The record is clear that the supervisors and cashiers at the Chew [f]acility were totally unaware that their actions could be a violation of the [p]olicy [m]anual, yet [DVS] chose not to advise

the Chew [f]acility supervisors of their [misconception and] instead set up an investigation to ensnare personnel so as to justify discharge. Given the myriad ways in which [DVS] could have dealt with this situation, and based upon a review of the record, the decision to terminate [plaintiff] for her participation in 'shared lunches' was arbitrary and capricious."

Even if we were to find that plaintiff improperly accepted Moss' offers of lunch money, we would agree with the trial court's conclusion that termination constituted an unusually harsh measure under these facts. This conclusion is particularly evident when one considers that plaintiff's supervisors believed that she acted in accordance with the policy manual. In fact, Tina Prose, the director of the department of personnel for the Secretary of State, testified that the policy manual does not prohibit employees from sharing lunches or accepting gifts from friends or coworkers. Therefore, we find that the Commission's decision was arbitrary and capricious.

## III. CONCLUSION

In summary, we find that the Commission's decision was against the manifest weight of the evidence. We further find that, under these unusual facts, termination constituted an extraordinarily harsh measure. We wish to stress, however, that we do not condone plaintiff's actions or the office culture existing at the Chew facility. Often, the line between proper and improper conduct is fine. Had we examined these issues under other circumstances, we might have reached a different result.

Based on the foregoing, we affirm the circuit court's determination.

Affirmed.

CAMPBELL, P.J., and GALLAGHER, J., concur.